[File Nos. 7279, 7280]

HAROLD W. LOVELAND, Respondent, v. ANDREW NIETERS and THOMAS RYAN, Appellants, and E. M. LOVELAND, Respondent, v. ANDREW NIETERS and THOMAS RYAN, Appellants.

(54 NW2d 533)

Opinion filed August 4, 1952

*Quentin N. Burdick* and *James R. Jungroth,* for appellant.

*F. E. McCurdy* and *Orrin B. Lovell,* for respondent.

·CHRISTIANSON, J.   This litigation arose out of a collision between two automobiles.   The plaintiff, E. M. Loveland, was driving a DeSoto automobile owned by his son Harold W. Loveland, incident to business affairs in which both of said plaintiffs were interested.   The defendant Thomas Ryan was driving a Ford automobile owned by the defendant Andrew Nieters.   Nieters was riding in the automobile so driven by Ryan.   The two automobiles met in a head-on collision at a point approximately four miles west of Regan in Burleigh County.   Both automobiles were damaged and the plaintiff E. M. Loveland and the defendants Ryan and Nieters all sustained personal injuries.   E. M. Loveland brought action to recover damages for personal injuries which he alleged that he had sustained by reason of the negligence of the defendants. Harold W. Loveland brought action against the defendants to recover compensation for the injury to his automobile which was driven by E. M. Loveland and alleged to have been caused by the negligence of the defendants Ryan and Nieters.   The defend-

ants Thomas Ryan and Andrew Nieters interposed individual answers denying liability and asserting counterclaims in each of the actions. The defendant Ryan in his counterclaim sought recovery for personal injuries which he alleged he sustained as a result of negligence of E. M. Loveland in the operation of the automobile he was driving, and the defendant Nieters in his counterclaims sought to recover damages for the injury to his automobile, which was being driven by Ryan and also sought to recover damages for the personal injuries which he alleged that he had sustained as a result of the negligence of E. M. Loveland in the operation of the car he was driving. E. M. Loveland and Harold W. Loveland interposed replies to the counterclaims wherein they denied all the allegations of the counterclaims. Upon the trial of the cases it was stipulated that the two cases be consolidated for the purposes of trial with separate verdicts to be rendered in each case. The cases were so tried to a jury. The jury returned a verdict in favor of the plaintiff E. M. Loveland for $15,000.00 and returned a verdict in favor of the plaintiff Harold W. Loveland for the sum of $881.02. Judgments were rendered upon the verdicts. The defendants moved for a new trial in each case. The motions were denied and the defendants have appealed from the judgments and from the orders denying the motions for a new trial.

The collision occurred in the afternoon of May 3, 1950. There was nothing to interfere with the visibility of objects within the ordinary range of vision. A member of the highway patrol who came to the scene after the accident did not find it necessary to utilize the lights on his car. The plaintiff, E. M. Loveland, was driving in a westerly direction on North Dakota Highway No. 36 and the defendants Ryan and Nieters were driving in an easterly direction on such highway. The two automobiles met in a head-on collision at a place where a cut had been made through a snow drift for a distance of approximately 200 feet or more. The cut was about 10 feet wide,—wide enough so that one car could go through but not wide enough so that cars could pass each other. The banks on the sides of the cut were of varying depths ranging from one or two feet near each end

and increasing to a depth of five or six feet at the middle of the cut. Loveland testified that when he saw the car occupied by the defendants approaching from the west he was nearing the west end of the cut and that the car occupied by the defendants was from 600 to 800 feet away and approaching at a rate which he judged to be about 60 miles an hour. Loveland testified that he was driving at a rate of about 20 miles an hour and that he reduced the speed almost to a standstill and that he thought "they would turn out but they came straight and hit me head-on." He testified that he did not travel more than 40 feet after he observed the car approaching from the west until the collision occurred; that the collision occurred a short distance from the west end of the cut. The defendant Ryan testified that he was driving at a rate of 30 miles an hour or less; that when he first saw the car driven by Loveland approaching from the east such car was 175 or 200 feet away. He testified also that it seemed to him that the car driven by Loveland was going faster than the car he was driving and when he saw the car coming he applied the brakes and "let off the accelerator." The plaintiff, E. M. Loveland, and the defendants were the only persons present at the time and place of the accident, although a number of persons came to the scene shortly afterwards. After the collision the two automobiles were left facing each other about 11 feet apart. Loveland was in the car which he had been driving and Ryan and Nieters were in the car in which they had been riding. All three had been seriously injured and were in a dazed condition. They were taken in an ambulance to a hospital at Bismarck for medical treatment. No good purpose would be served by any further or extended recital of the evidence. We are agreed that the state of the evidence is such that questions of negligence and proximate cause were for the jury; and there is indeed no contention to the contrary on this appeal.

In the brief of the appellants it is said that the errors assigned "actually present three questions for this court to decide.

"First: Was it error for the District Court to have failed to instruct the jury on contributory negligence?

"Second: Was it error to refuse a mistrial, when F. E.

McCurdy attorney for the plaintiff injected the Farmers Union into the case, during the empanelling of the jury?

"Third: In all event, is the verdict excessive?"

(1) The defendants moved for a mistrial. The motion was denied and error is predicated upon the court's ruling in denying such motion. The motion was made during the examination of prospective jurors on their voir dire. During the examination of Mrs. Random, the first prospective juror, on her voir dire plaintiffs' counsel asked, "Are either you or your husband members of the Farmers Union?" Thereupon defendants' counsel stated "At this time I move for a mistrial; it is prejudicial." Thereupon plaintiffs' counsel stated, "We want to know the background of these jurors so that we may properly exercise peremptory." To which defendants' counsel replied, "It has no basis, your Honor, and we would like to be heard on this motion in chambers, your Honor." Thereupon the court directed that the prospective members of the jury remain in their seats and the court and the parties with their counsel retired to the chambers. Arguments were presented by the counsel for the respective parties upon the motion for a mistrial. Such arguments and proceedings were all had outside of the presence of the prospective members of the jury. After the proceedings in chambers had been concluded the parties and their respective counsel returned to the court room. The court thereupon made a statement wherein he said in part:

"Mrs. Roy Random was asked the question, as a prospective juror, as to whether or not she was a member of the Farmers Union, . . . . I want to say to you that the Farmers Union, so far as the Court knows, and so far as the counsel has informed the Court, and I have tried to find out all the information that they had, and I hope that I have, and from all the information that I have the Farmers Union just has no interest in this lawsuit in any way, so the jury here can disregard that statement, wipe it out of the case and out of your memory; it is just not here. . . . So, in reference to that statement, and that question, the Court will just take that over and take care of it, and it is out of the lawsuit, and you will put it out of the lawsuit. This is just not here for consideration. The Farmers Union has no

interest in this case, none whatever, and you will consider this case in that fashion if you are selected on the jury."

The court thereupon directed that the trial continue. A jury was selected, impanelled and sworn to try the case. At the close of all the evidence and after both parties had rested counsel for the defendants renewed the motion for mistrial. The motion was denied. Error is assigned upon the rulings of the court.

The laws of this state provide for an examination of prospective jurors before they are impanelled and sworn to try a case. NDRC 1943, 28–1404. Each party to a civil action is entitled to challenges for cause on certain specified grounds; and each party is also entitled to a certain number of peremptory challenges. NDRC 1943, Sec. 28–1406, 28–1405.

In American Jurisprudence it is said:

"Examination into the qualifications, attitudes, and inclinations of jurors, before they are impaneled and sworn to try a case, is necessarily incident to the practice of challenging. Only such an examination can provide the information or suspicion to constitute a basis for the intelligent and practical exercise of challenges to accomplish the end desired—exclusion from the jury of those who would act from prejudice or interest or without qualification to judge soundly." 31 Am Jur, Jury, Sec 104, p 635.

"An examination of a prospective juror on his voir dire is proper so long as it is conducted strictly within the right to discover the state of mind of the juror with respect to the matter in hand or any collateral matter reasonably liable to unduly influence him, and questions which go primarily to the ascertainment of any probable bias or ground of incompetency, as a basis of a challenge for cause, or possibly, of a peremptory challenge, are permissible. However, while the scope of the inquiry will not be confined strictly to the subjects which constitute grounds for the sustaining of a challenge for cause, if it extends beyond such subjects it must be conducted in good faith with the object of obtaining a fair and impartial jury, and must not go so far beyond the parties and the issues directly involved that it is likely to create a bias, a prejudice, or an unfair attitude toward any litigant. Nevertheless, the adverse litigants should

be given the right to inquire freely about the interest, direct or indirect, of the proposed juror, that may affect his final decision. The scope of inquiry is best governed by a wise and liberal discretion of the court, but the court should not at any time ask, or permit counsel to ask, a prospective juror any question the answer to which would tend to incriminate or disgrace him." 31 Am Juris, Jury, Sec 107, pp 636–637.

"In most jurisdictions jurors may be questioned on their voir dire examination within reasonable limits to elicit facts enabling the parties intelligently to exercise their right of peremptory challenge; the nature and extent of the examination is largely within the discretion of the trial court." 50 CJS Juries, Sec 279, p 1066.

So far as the record shows the question which formed the basis for the motion for a mistrial was never answered. The record does not show whether the prospective juror to whom it was addressed was accepted and served as a member of the trial jury nor does it show whether any challenges were made to any prospective juror either for cause or peremptory. There was no request that the juror to whom the question was addressed or any person or persons be withdrawn. It is difficult to see how the asking of the question could possibly have created any bias or prejudice or unfair attitude on the part of any member of the jury toward any of the litigants. There is no claim and obviously there would be no basis for any claim that the question called for an answer which would tend to incriminate or disgrace the juror.

It is inconceivable that any person who was impanelled and sworn as a juror could have been affected or influenced by the fact that the question had been asked. Furthermore, the statement and admonition of the trial court operated to eliminate and withdraw from the consideration of the jury the question and all that took place with respect thereto. Ordinarily when a motion is made for a mistrial it is upon the occurrence of some incident of prejudicial misconduct at the trial or when incompetent matters have been brought to the attention of the jury, the damaging effect of which cannot be removed by admonition and instructions, and when something has happened affect-

ing the propriety and validity of the proceedings. In this case the incident upon which the motion for mistrial is based occurred at the very beginning of the examination of jurors on their voir dire. The question to which objection was made was propounded at the very beginning of the examination of the first prospective juror on her voir dire. If the motion for mistrial had been granted it would merely have operated to terminate the proceedings that had just begun and set the trial over to a future day. Bishop Code Practice, Sec 428; 53 Am Jur, Trial, Sec 965, p 678.

In Hoffer v. Burd, 78 ND 278, 49 NW2d 282, 292, this Court said:

"A mistrial is granted generally on some fundamental failure in the proceeding, . . . . A mistrial may also be granted 'when necessary to prevent the defeat of justice or in furtherance of justice.' 53 Am Jur, Sec 967, Trial, p 679.

"In such cases the trial court has wide discretion, Heiler v. Goodman's Motor Express Van & Storage Co., 92 NJL 415, 105 A 233, 3 ALR 336. The granting of a mistrial is an extreme remedy and voids all proceedings taken in the case up to that time. All the authorities agree that the practice should be resorted to only 'when further proceedings therewith would be productive of great hardship or manifest injustice.' Usborne v. Stephenson, 36 Or 328, 58 Pac 1103, 1104, 48 LRA 432, 437. In such cases only where something has happened to make it apparent that justice will not be served by continuance of the trial is the granting of a motion for a mistrial the proper remedy."

We are all agreed that no error prejudicial to the defendants was committed by the trial court by the denial of the motion for a mistrial.

(2) It is next contended that the trial court erred in failing to instruct the jury on the question of contributory negligence. The record shows that the defendants served and filed an amended answer and counterclaim in each of the cases and that each of the cases was tried upon the issues framed by the amended complaint of the plaintiffs and such amended answer and counterclaim. There was no plea of contributory negligence in

10

either of such amended answers or counterclaims. In most jurisdictions, including North Dakota, it is the rule that the defense of contributory negligence must be specially pleaded and if not so pleaded is regarded as waived. 65 CJS p 923–925; Carr & Erickson v. Minneapolis, St. P. & S. Ste. M. R. Co., 16 ND 217, 112 NW 972; Welch v. Fargo & M. Street R. Co., 24 ND 463, 486, 140 NW 680; Ignatowitch v. McLaughlin, 66 ND 132, 262 NW 352. No request was made for instruction upon the question of contributory negligence,—indeed, no request was made for any instruction.

· The trial court committed no error in failing to instruct as to contributory negligence.

'No error is assigned upon any of the instructions given to the jury. The sole error assigned upon such instructions is that the court erred in failing to instruct upon the question of contributory negligence. As said, the plaintiffs predicated their right of action upon the alleged negligence of the defendants; and the defendants predicated their counterclaims upon the alleged negligence of the plaintiffs. In its instructions to the jury the court instructed fully with respect to these respective claims and informed the jury that the plaintiffs could recover only if the jury found that the defendants were guilty of negligence as charged and that the plaintiffs were free from negligence. In its instructions the court said:

"The plaintiffs, Members of the Jury, in this case seek to recover of the defendants and base their right of recovery upon a charge of negligence of the defendants. The defendants seek to recover of the plaintiffs and base their right of recovery upon a charge of negligence of the plaintiffs. . . . It is only when one party is guilty of negligence as charged by the other, and the other party innocent of blame, that there can be a recovery; and in such event, the party who is proven to be the guilty party is responsible for such damage as proximately results from his negligence so charged and proven. . . . The plaintiffs can recover in this action from the defendants upon no other theory than that the jury find by a preponderance of the evidence that the defendants were guilty of negligence as charged

·by the plaintiffs, and that the plaintiffs were free from negligence proximately causing their injury and damage claimed."
. It is unnecessary for us either to approve or disapprove the above quoted instruction or to express any opinion as to the correctness thereof as no such question is presented on this appeal. It will be noted that under such instruction the jury is informed that "it is only when one party is guilty of negligence as charged by the other and the other party innocent of blame that there can be a recovery;" and that the plaintiffs in this action can recover upon no other theory than that the jury find by a preponderance of the evidence (1) that the defendants were guilty of negligence as charged by the plaintiffs, and (2) that the plaintiffs were free from negligence proximately causing their injury and damage claimed. It is apparent that the effect of this instruction was to bar recovery on the part of the plaintiffs if they were guilty of contributory negligence, for obviously a person who is guilty of negligence which proximately contributes to the injury is not "innocent of blame" and is not "free from negligence proximately causing their injury."

(3) It is next contended that the verdict is excessive and was given under the influence of passion or prejudice. Under the laws of this state excessive damages appearing to have been given under the influence of passion or prejudice are a ground for a new trial. NDRC 1943, 28–1902, subd 5. A motion for a new trial on such ground involves consideration of the evidence and implies a duty on the part of the court to whom the motion is addressed to weigh the evidence. "This necessarily involves an exercise by the trial judge of the superior knowledge possessed by him as to matters incident to the trial itself." Reid v. Ehr, 36 ND 552, 557, 162 NW 903–905; Hayne, New Tr & App, Sec 95.

In Reid v. Ehr, supra, this Court said:

"There is no serious question as to the rules of law which should guide a trial court in determining, or an appellate court in reviewing rulings on, motions for a new trial on the ground of excessive damages appearing to have been given under the influence of passion or prejudice. The difficulty, if any, generally arises in determining whether the particular facts in a case bring it within such rules.

"In actions in which there is no definite or legal measure of damages, as is especially true in most actions sounding in tort, the quantum of damages is deemed a matter of discretion for the jury to such an extent that the verdict will not be set aside on this ground alone, unless the amount awarded is so excessive as to appear to have been given under the influence of passion or prejudice. The discretion of the jury in fixing damages in such cases is not absolute, however, and 'in whatever form the rule is stated, it always involves a reasonable discretionary power in the court to set aside a verdict when its amount, in view of all the circumstances, is so great as to show that the jury, in arriving at it, must have been influenced by some improper motive.' 4 Sedgw Damages, 9th ed, Sec 1326."

There is a clear and obvious distinction between the duty of a trial court and the duty of an appellate court with respect to the decision of such questions. Green v. Soule, 145 Calif 96, 78 Pac 337, 340.

"It should be remembered that it is the trial, and not the appellate, court which is vested with discretionary powers in determining the motion for a new trial." Reid v. Ehr, supra.

The appellate court is limited to a consideration and determination of whether the trial court abused its discretion in granting or denying a new trial. The question presented to the appellate court is not whether a new trial should be granted or denied, but whether the trial court abused its judicial discretion in granting or denying a new trial as the case may be.

" 'A test of what is within the discretion of a court has been suggested by the question, May the court properly decide the point either way? If not, then there is no discretion to exercise. If there is no latitude for the exercise of the power, it cannot be said that the power is discretionary. The only limitation upon the exercise of discretionary power is that it must not be abused.' 2 Hayne, New Tr & App, Sec 289, p 1650.

" 'While it may be difficult to define exactly what is meant by abuse of judicial discretion, and whatever it may imply as to the disposition and motives of the judge, it is fairly deducible from the cases that one of its essential attributes is that it must plainly

appear to effect injustice.' Clavey v. Lord, 87 Cal 413, 25 Pac 493; Aylmer v. Adams, 30 ND 514, 153 NW 419; State v. Cray, 31 ND 67, 153 NW 425; McGregor v. Great Northern R. Co. 31 ND 471, 154 NW 261, Ann Cas 1917E 141.

"In reviewing the action of the trial court in granting a new trial on the ground of 'excessive damages appearing to have been given under the influence of passion or prejudice,' the appellate court is not justified in reversing the order merely because it differs with the trial court as to what would have been just compensation, unless the difference of opinion is such as to justify the conclusion that the court abused its discretion. Hayne, New Tr & App, Sec 95; Lee v. Southern P. R. Co. 101 Cal 118, 35 Pac 572." Reid v. Ehr, 36 ND 552, 558, 162 NW 903, 905.

To warrant the granting of a new trial on the ground of "excessive damages appearing to have been given under the influence of passion or prejudice" the amount of the verdict must appear to be so large as to induce the belief that the jury were actuated by passion or prejudice. 39 Am Jur, New Trial, Sec 144, p 150; 66 CJS, New Trial, p 244; 25 CJS Sec 196, p 910; Umphrey v. Deery, 78 ND 211, 48 NW2d 897. See, also, 5 CJS, Appeal and Error, p 642 et seq. The evidence in this case shows that the verdict returned by the jury in the case of Harold W. Loveland v. Andrew Nieters and Thomas Ryan was only in a sum equal to the amount that the plaintiff in that case was required to expend in necessary repairs on his car as a result of the injury caused by the collision. There is no contention that the amounts expended were in excess of what was necessary. Obviously, so far as the verdict in that case is concerned, the verdict is not excessive in any sense but is rather less than the amount of damages which the evidence shows that the plaintiff sustained.

The evidence in the case of E. M. Loveland v. Andrew Nieters and Thomas Ryan shows that the plaintiff in that case was actively engaged in the operation of grain elevators and that on the day the collision occurred he drove to the elevator at Still and loaded a car of grain; that he did this without any assistance and performed all the manual labor himself; that thereafter

he drove to the depot at Regan, a station a few miles from Still, and billed the car and that it was thereafter he sustained the injuries in the collision. Following the accident he was taken in an ambulance to a hospital at Bismarck and remained confined to his bed in the hospital for 58 days. After being released from the hospital he was taken to the home of his son where he remained confined under the care of his son and his son's wife for about two months. The attending physician and surgeon who cared for him testified that Loveland was in shock, "that he had no blood pressure, he was semi-conscious, and bleeding badly." The doctor further testified:

"Q. Go ahead and tell us what you found in your examination.

A. He was admitted in the hospital in shock; he had a severe laceration of the scalp; fractures of the 1st, 2nd, 3rd, and 4th left ribs; fractures of the 1st, 4th, and 5th right ribs; a comminuted fracture of the right knee; a compound, comminuted fracture of the left radius and ulna; a pneumothorax and a hemothorax.

Q. Doctor, will you be good enough to define those terms so the Jury will understand them?

A. By pneumothorax and hemothorax, it pertains to the chest, where the air is able to go into the chest wall rather than through the mouth with the result that the left lung was completely collapsed; the secondary to that there was hemorrhage into that space where the lung should be. In other words, the left chest was entirely full of blood rather than the normal expanded lung.

Q. And those other medical terms?

A. By compound, comminuted fracture we mean a fracture where there is a bone sticking out through the skin; comminuted means small pieces of bone, and compound is an opening of the skin where the bone is sticking out; that was the case with the wrist, the bone was actually sticking out of the skin; and it is called comminuted because it was broken in many small pieces not through the skin; and the rest were simple fractures. . . .

Q. You say there was a severe laceration of the head?

A. Yes, sir.

Q. What is that?

A. A cut through the scalp.

Q. How long was it?

A. About 4 inches.

Q. How many stitches does it take?

A. Oh, I suppose about 18 or 20.

Q. Was there anything outside of that break of the skin where the bone was broken and out of the skin, was there any other break in the skin?

A. The entire body was covered with abrasions; that is, injuries to the skin. . . .

Q. What was done by way of undertaking to cure him of those?

A. The first 11 days he was in the hospital we were unable to do anything as far as immediate fractures were concerned because we were concerned with keeping him alive; we gave him oxygen to supplant his chest so he could breathe some; his blood pressure got better; and we tried to keep him free of pain; we didn't attempt to set any fractures for 11 days; in the first place, he could not stand an anesthetic.

Q. So that the first 11 days were devoted entirely to life preservation?

A. Yes, sir.

Q. And during this time what would you say would be the natural result of those injuries relative to pain and suffering?

A. Considerable.

Q. Well, considerable is a kind of an elastic term—

A. I believe the patient was in pain constantly for the first month—in severe pain.

Q. And you controlled that to a certain extent by anesthetics?

A. We were handicapped somewhat because the drugs that will control pain depress respiration and had we given him adequate drugs to kill the pain we might have put the patient in a bad situation.

Q. In other words, you were unable to give him the drugs that would deaden the pain to the extent you would have liked to?

A. Yes, sir.

Q. And how long a period did that continue where his pain was partially uncontrolled?

A. I would say about 6 weeks.

Q. About 6 weeks?

A. Yes, sir, about 6 weeks.

Q. And what was his condition as to suffering acute pain in those 6 weeks?

A. I would say that he suffered considerable pain; he was in pain almost every time I examined him; with each time he took a breath he had pain because the fractured ribs would move a little bit, so he had constant pain in his chest at least 6 weeks with every inspiration of air.

Q. What effect did that have on a full and free respiration?

A. It definitely limits it.

Q. Now, were there any lung punctures?

A. That cannot be proved exactly because we cannot look in the chest, but the evidence of the pneumothorax and the hemothorax would lead us to believe that it did happen. . . .

Q. Taking him now as he is, as far as manual labor is concerned, what percentage of disability would you attribute to him at the present time, for manual labor? I don't mean clerical work.

A. I don't believe he can do any manual labor.

Q. How about doing clerical work?

A. Yes, sir, he can do that.

Q. Would he be handicapped somewhat in that?

A. He would be handicapped so far as a typewriter is concerned, completely.

Q. Typewriting would be out?

A. Yes, sir. . . .

Q. Now what effect, if any, has this experience had on his general physical condition?

A. Whenever you have a pneumothorax or an hemothorax—a collapse of the lung—it always heals with considerable scar tissue, and he is very subject to pneumonia in the future. I mean that is something he will have to watch closely because he will never have as good a left lung as he had originally, and he

probably—although I can't guarantee, I don't know—but he may have pleurisy pains in the future. That is something that only time will tell."

The doctor further testified that the plaintiff E. M. Loveland has only about 50% use of the arm and wrist and that this condition is permanent. He also testified that as a result of injuries sustained there was a 50% disability of the right leg and knee; that Loveland was unable to walk even up to the time of the trial without the aid of a crutch because he could not fully extend or flex the knee and that this condition was probably permanent. He also testified that it would be necessary for Mr. Loveland to have medical treatment for another six months.

The evidence shows that plaintiff E. M. Loveland was required to expend for hospital service, including the ambulance service, the sum of $955.68 and that he has expended for the services of doctors the sum of $500.00.

The trial court denied the motion for a new trial. He found that the verdict was not tainted with passion and prejudice. We are agreed that when all the pertinent facts in this case are considered it cannot be said that the amount of the verdict is so large as to indicate passion or prejudice by the jury.

The judgments and orders appealed from are affirmed.

Morris, C. J. and Burke, Grimson and Sathre, JJ., concur.